Please be seated. And good morning. Judge Floyd and Judge Harris and I are pleased to be hearing your cases today and we'll proceed first in the case of Christina Lynn Jacobs v. NC Admin Office of the Courts. Ms. Lucas. Good morning, Your Honors. May it please the Court, Vanessa Lucas for Plaintiff Appellant Christina Jacobs. We are here today as the lower court granted summary judgment on Ms. Jacobs' claims under the Americans with Disabilities Act, the Rehabilitation Act, and North Carolina Common Law. Defendants argued summary judgment based on- Let me ask you before you get too far are you really appealing the state law claims? Yes, Your Honor. You are? Yes. Okay. The defendants argued summary judgment relying almost exclusively on disputed facts as portrayed by the defendants, including assumptions of the credibility of defendants' witnesses over Ms. Jacobs and documents that corroborated Ms. Jacobs' testimony. The lower court acted as fact finder and adopted these disputed facts, failing to believe the evidence of Ms. Jacobs and justified inferences are in her favor. There's reasonable evidence that a jury could find in favor of Ms. Jacobs' honor claims, and really there's three major areas of disputed facts. The first is whether Ms. Jacobs has a disability. The second is whether the clerk of court, Brenda Tucker, knew of Ms. Jacobs' disability and her request for accommodation prior to Ms. Jacobs terminated. Looking first at the area of facts surrounding Ms. Jacobs' disability, Ms. Jacobs' medical records show that since she was a young child, she's had a history of anxiety. She was first diagnosed with social anxiety disorder in college and prescribed medications at that time. Now, having social anxiety doesn't mean that a person does not want to interact with others. It means that social interactions can cause extreme degrees of anxiety that are beyond what is typical. And despite Ms. Jacobs' lack of social interaction during college, she was able to graduate from UNC Wilmington, and she had a degree in both criminal justice and English. Her first job out of college was with the New Ann Arbor County Clerk's Office, and she was hired as an office assistant in January of 2009. She was quickly promoted to deputy clerk of February in 2009. And again, throughout this time at the deputy clerk's office, her social interactions were minimal. Now, this court's recognized that the ADA Amendments Act has changed the definition of disability considerably and in significant ways. And the point of the act was to broaden the scope of people that are falling under the act and to concentrate more on whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual is meeting the definition of disability. There's significant evidence that Ms. Jacobs is disabled. Plaintiff's expert, Dr. Claudia Coleman, found under the DSM-IV that Ms. Jacobs has social anxiety disorder that substantially limits the records as the defense expert, Dr. Corvin, whose conclusions were relied on by the lower court. Unlike Dr. Corvin, though, Dr. Coleman did an in-person interview of Ms. Jacobs and did examinations and testing. Summary judgment is inappropriate here. I have just a quick question. So it seems like the real dispute is, or at least one of the real social anxiety disorder, whether it really affected her ability to interact with others at work. And it seems like the expert who examined her, I mean, did the expert go to the workplace and see how she was interacting with other people? No. The expert met with Ms. Jacobs after the termination had already occurred. Because it seems like the district court thought that there was plenty of evidence in the record showing that she could, in fact, interact with others in the office. What do you do with that? Well, that is unfortunately a misunderstanding of what social anxiety disorder is and what interacting with others is. Now, what we're looking at under the ADA Amendments Act is whether this person is different than the general population in how they interact with others. It does not mean that she couldn't go to work and interact with others. It means that she has symptoms that are beyond what the general public has. And many of the facts about how she with others at work are in dispute, disputed specifically by Ms. Jacobs about her social interactions. But it's not disputed that in the seven months at the clerk's office that she had very few interactions outside of the office, went to lunch with coworkers, went to a bachelorette party that she was invited to, to a dinner, which a jury, unlike some things like endocrine function, might not be able to understand, 12 people can look at Ms. Jacobs' social interactions and say this is not what the general population has as far as interacting with others. And again, it doesn't mean she doesn't want to interact. She wanted to work at the front counter. She wanted to do a good job. But it was causing her this anxiety that we aren't necessarily able to see from how she is at work. But it's also how you are at home, how you are on the weekends when you're not at work. Isn't the finding that not a major life activity a challenge to the EEOC interpretation? Yes, because the... So it would be a Chevron analysis. Yes. And at this point, there is not anything that goes specifically against the delineation of interacting with others as a major life activity. And also with the ADA Amendments Act, one of the purposes was to allow the EEOC to delineate more major life activities. And even prior to the case, the Fourth Circuit hadn't denied that interacting with others was a major life activity. It just hadn't gotten there. And in fact, no court had actually reached the decision of whether interacting with others was not a major life activity. Do you read the district court opinion as holding that interacting with others is not a major life activity, the district court found? It was a little unclear to me, and I'm wondering how you read it. Yes. Excuse me, Your Honor. I think that the district court was really relying on Dr. Corbin's opinion and his actual misinterpretation of what disability and major life activity and substantial limits are. So I think all of those were included because of that reliance on Dr. Corbin's opinion. I think it's inappropriate because we have an expert that is supporting the non-moving parties case. So at this point, the lower court should not have been making decisions about which expert to credit, only whether or not the experts actually met the rule of 702. Well, Ms. Lucas, there is record evidence that there was a diagnosis as early as, what, when the plaintiff was 12 years old? There was evidence of anxiety, yes. Was that an official diagnosis? It was done by a doctor. There wasn't a social anxiety disorder. Was this the same diagnosis that the gynecologist gave years later? Could you be more specific as to what the record shows on that? Yes. The first time that social anxiety disorder was specifically diagnosed was in college with the gynecologist and then her physician's assistant who was her primary care doctor. Okay. So the earlier references were merely to the existence of anxiety, but not an official diagnosis. Right. But it's evidence that she's had a disability that may or may not have been diagnosed correctly going back to when she was a young child. And beyond the issue of disability, next we look at the disputed issues of fact regarding the clerk about the disability and the request for accommodation. Well, the judge seemed to accept Ms. Tucker's version of events. Is that what you're saying in that he wasn't in a position to do that? Exactly, Your Honor. The documentary evidence actually points to the fact that the clerk knew of the disability and request for accommodation. On May 5, 2009, there's a note dated in the file that Ms. Tucker, the clerk of court, she admits to having written that she said was based on a conversation with a supervisor who had taken a disclosure of disability from Ms. Jacobs. And she basically wrote notes that included, quote, anxiety disorder, unquote, and also specifically talked about my client saying that she had to go back to the doctor. So the clerk's own testimony is contradicted by this note that's at appendix page 823. Likewise, there's evidence that the clerk was aware of the request for accommodation prior to the termination. Ms. Jacobs sent the accommodation request on September 8, 2009, to all of her supervisors. It was entitled front counter accommodation. It used the word disability and social anxiety disorder. And she followed up about the email. The supervisor thought it was important, file stamped it, but told her that the clerk is out of the office and none of your supervisors can make this decision. So we have to wait until the clerk comes back. The clerk comes back on September 29. Ms. Jacobs enters the office. Her supervisors are there. And she sees her reasonable accommodation email with handwritten notes on the desk in front of Ms. Tucker. And those notes on the email are at joint appendix 824. And the district court opinion relies on Ms. Tucker's testimony over Ms. Jacobs' testimony despite the dispute of fact and the written email. In fact, the writing on the email corroborates Ms. Jacobs' testimony, as does the audio recording of the termination meeting. In the termination meeting, twice Ms. Jacobs brings up the email. And contrary to the clerk's deposition testimony, there's nowhere where she says, quote, what email. In fact, the inference really is that she knew exactly what email that Ms. Jacobs was talking about. And her testimony that she pulled the email at that point and read it doesn't match with any pause that we find in the audio recording that she could have pulled this email. And now we have evidence that this request for accommodation and the termination happened in this short time period, in fact, less than three weeks. So we have temporal proximity, according to Halbrook v. Michel in North America, that gets us past the prima facie case. Okay. Ms. Lucas, let's say we agree with you that the trial court improperly resolved the case on the record before us. What do we do? Do we send it back for the court to look at steps two and three of the analysis of your cause of action? Because the court really only considered the first step, whether she had a disability. Or do we send the case for trial? What is your position on that? Our position is that the case gets sent for trial. Why? Why shouldn't the trial court have the opportunity to examine the other elements for summary judgment purposes? You have de novo review. All of the issues have been thoroughly briefed at this stage. And by remanding, we're giving the defendants another chance to have summary judgment on the additional elements. And there was a decision also on the retaliation, which had specifically to do with the knowledge, which, as I stated, there's disputed facts as to Ms. So one thing, have the North Carolina claims been briefed before us? The state law claims? Your Honor, I can't remember exactly what was briefed, but the law for the North Carolina claims follows the ADA and the Rehabilitation Act. These are all the same burdens. So the North Carolina common law claim just graphs precisely onto the ADA claim? Yes. If you win here, does it make any difference whether you have the North Carolina claims or not? In terms of damages, that would be the only difference. The jury has the opportunity to make a decision, and we never know what a jury is going to do on different issues, but those claims should all be brought before the jury to make a decision. Kind of skipping to the pretext issue, again, the major argument for pretext is really the allegations and the lack of documentation. And we have opportunities for these alleged performance issues to be documented. For instance, they allege that Ms. Jacobs was sleeping on the job, which Ms. Jacobs, of course, denies, so that's a disputed area of fact. But the clerk had the opportunity at the termination meeting to bring up sleeping, and it was not, and we have that on audio recording, so we know that's true. We also have the letter to the AOC after the charge of discrimination was received that doesn't mention sleeping. We have the five-page letter to the EEOC that doesn't mention sleeping. And we have the clerk's handwritten notes that she testified were to explain the reasons for the termination later on that also does not mention sleeping. I don't mean to get you off track, but I had a question about the unreasonable accommodation claim, or the failure to accommodate claim. Is your argument that working at the front counter is not an essential function of the job? Yes, that is the argument. There were nearly 30 clerks in the criminal division, and only two of them worked at the front counter. At one time, right? Hadn't they all worked at the front counter first? Isn't that sort of the gist of the claim, that it's an essential part of training for the job? And Ms. Jacobs had been at the front counter for seven months as well, and there were other clerks during... I guess I really just want to understand what you're saying here. Those seem like two different arguments. One is it's not an essential function. One is, well, maybe it is, but she's already done it. Okay, so as far as the essential function, we have to look at whether all the employees are made to do it. And that's just the initial inquiry, but this is going to be a factual decision for the jury. And given that there were other people that could fill in at the front desk, given the fact that Ms. Jacobs was terminated when there was a hiring freeze, so nobody was going to be working at the front desk except for someone else who's already at the clerk's office, was doing it, that we do not believe that it was an essential function. But because of the numerous contradictions among the defendants, there is enough for pretext to be shown. And I don't mean to interrupt you, Ms. Lucas, but you are eating into your rebuttal time now. Do you want to do that? Oh, I'm sorry, Your Honor. I just didn't know. I mean, you're free to do that, but I just want you to know that there's a penalty on the other end if you do. I understand. If you don't have any further questions right now, I'll sit down. Okay, thank you. Ms. Shields? May it please the Court, I'm Katherine Shields, an Assistant Attorney General with the North Carolina Department of Justice. I am appearing today on behalf of the appellees. The District Court correctly granted summary judgment in favor of the appellees when it found that the plaintiff does not suffer from a disability as defined by section 12102 of the Americans with Disabilities Act as amended, as she does not suffer from an impairment that substantially limits a major life activity. It really seems curious though to me, Ms. Shields, and I think this is the most serious, one of the most serious aspects of my concern with this case is that the District Court just kind of factor, doesn't even address Dr. Coleman's report, doesn't address her diagnosis or anything, and just kind of flies on by and says there's nothing wrong with this woman. I'm granting summary judgment in favor of the defendant. How can you say that that is the correct result? I believe that the District Court, when it looked at the expert reports, and it addressed this in its order. Do we even know that he looked at the report for the plaintiff? While it doesn't state in the order specifically that he, while it doesn't state in the order that according to Dr. Coleman's report and Dr. Corbin's report, the District Court said based on the evidence in the record, which did include Dr. Coleman's report, it was in the record before the District Court, and I think it's very instructive that he said based on the plaintiff's own behavior, she was not substantially limited in her, the major life activity of interacting with others, which is what the record, there's just, there's, the record is full of evidence that she was not in fact limited in the ability to interact with others. Didn't the record cut both ways on that subject? It didn't, it did not. The record shows that. What about her own testimony? Her own testimony says that she, when she was working at the clerk's office, she was able to make friends with another deputy, another deputy clerk. She had lunch with this deputy clerk. She wished that she had more time or was able to have lunch with her more often, but her schedule did not permit it. She testified that she did in fact go to this bachelorette party, which indicates . . . But you know, it seems to me, Ms. Shields, you're doing just what the trial court did. What about the other evidence that she talked about, the panic attacks and the headaches and the anxiety? That's also in the record, and isn't that a disputed issue, a fact? That's what we're getting at. Not that you're not going to win your case, but was it proper for you to win it at this juncture? The evidence in the record doesn't seem to indicate that she was having that anxiety while she was at work. There is evidence from her testimony and her testimony only about this anxiety. The expert report went into that her anxiety caused her such fear that she could not speak to people outside her family. The evidence in the record just does not support that. The evidence in the record shows that she could in fact speak to members outside the family. The evidence also doesn't support her assertion that she was having panic attacks and crying uncontrollably at the clerk's office because of this anxiety. There's not evidence that her co-workers saw her crying. So your position is that you have to physically manifest the anxiety on the job. It cannot be an internal problem that you are experiencing that causes your disability. It has to be outwardly manifested so others can see it. Again, the evidence just doesn't support this anxiety. The evidence that she was having such anxiety that she could not, that she was limited in her ability to interact with others, which is really the legal question that was before the court. And so there's this evidence that yes, she could have a disability. She could have this mental impairment of social anxiety disorder. But what the ADA requires is the court look at whether, the court perform this individual assessment as to whether she's actually substantially limited in a major life activity. So are you contesting that interacting with others is a major life activity or are you assuming that now? I wasn't entirely clear on that. Well, this court has said that interacting with others is a very difficult major life activity to, to qualify. That was before the 2009 amendments in the EEOC regulation? Okay. Yes, Your Honor, that was before. Put that to one side. So what's your position now? My position is that it is a very difficult major life activity for this court to 100% say it is a major life activity. As compared, if what the law requires us to do is say, as compared to the general population, is this person substantially limited in her ability to interact with others? And that is a very abstract concept for the courts to have to work. It's a very difficult standard. I do believe that. And it's just, it's just not as easy as, is she substantially limited in the major life activity of, if it's a, Ms. Lucas mentioned an endocrine disability, which are some of those major life activities that under the ADA will always be, if you have an impairment of your endocrine function, that will always be a disability. But social anxiety disorders... Well, I don't understand. Why is it different from, say, walking? Like, what if you can walk, you know, pretty well, but your ankle's hurt at the end of the day? Like, I don't understand why you wouldn't have to make those kind of careful relative judgments in all kinds of cases. Oh, well, I did not mean to imply that, Your Honor. Okay, so how is it different from... Just with the ability to interact with others, Ms. Jacobs, as compared to those in the general population, she was able to interact with others. In terms of her position, she was able, there's no evidence that she was not able to answer questions from the public. She made mistakes when answering questions from the public, but the evidence shows that she was able to interact with her co-workers. She chatted with her co-workers. Doesn't the record show that it took her longer to do the microfilming than others? I mean, couldn't the jury reasonably infer that, you know, she was having these panic attacks, anxiety that caused that? Couldn't the jury infer that? The evidence does state her co-workers did testify that it took her longer to master the functions, that it did take her longer to microfilm. It did take her longer to learn and master her duties at the front counter than what they expected. As to a jury deciding whether her anxiety caused that, Ms. Jacobs didn't testify that her anxiety caused her to microfilm longer than she was expected to. Ms. Jacobs' testimony is that she didn't take longer to microfilm than what she was supposed to do. She testified that it was only on holiday weekends at the beach that it took her longer to perform her microfilm duties. I would like to address a couple of things that came out in Ms. Lucas' argument, the fact that if this court were to remand on the issues, I would ask that I don't consider the state law claims to have been fully briefed at this point and would like the opportunity to go back and do that. I also believe that if this court were to find that she does meet the threshold requirement for disability, for having a disability as defined in terms of the ADA, I would like I'd succinctly brief... The court wouldn't be making that finding. The court would say the evidence is in dispute regarding whether you have two doctors who have different opinions in the case and therefore that is a disputed issue of fact that needs to be resolved. Correct. But couldn't we say though that insofar as interpreting the ADA, interacting with others is a major life activity? Not that we're saying that the evidence shows that in this case, but let's just clear the air for the Fourth Circuit. Could we do that? Yes, Your Honor. And if we were, and if this court were to do that, if we meet, if that issue, if this case does go back to the district court, I would ask that while the second and third elements of the prima facie case of the discriminatory discharge as to whether she can perform, whether she was performing the essential functions of her job, I disagree that she can still make the prima facie case to get to the pretext argument that Ms. Lucas was talking about earlier. In terms of the pretext, the evidence shows that while there are not written warnings in the plaintiff's personnel file, under North Carolina law, employees of North Carolina's judicial branch are not subject to the protections of the North Carolina State Personnel Act that other North Carolina employees are provided, such as a formalized grievance procedure prior to being terminated. They're not provided, it's not required of the clerk of court to have written warnings in employees' personnel files. It's not required, but still, isn't it somewhat unusual to have an employer who thinks they've got all these problems with an employee, and they know the employee, I don't want to resolve any factual issues, but have at least written a note saying that the employee has an anxiety disorder that may require the employee to go to a doctor, so at least on notice that maybe there's going to be a disability claim lurking out here, and they never write anything down? If you open the personnel file, all you see is, well, she's disabled, and nothing else. Doesn't that seem at least unusual? Not in this instance, because Ms. Tucker, the elected clerk, it was not her practice to write down performance issues. She did show that she was disabled and put that in the file. She, based on a telephone call, but Ms. Tucker's testimony was that it was her practice to not put written warnings in people's files because she didn't want it to follow, and it is incredulous. Maybe she can't fire anybody. But she also went on to testify in her deposition that with another employee who she ended up terminating, and this employee for having tattoos, she also didn't write them up. She verbally warned this employee about not having her midriff showing and having her tattoos visible at her office, which was one of Ms. Tucker's rules, and this employee also was let go and also did not have written warnings. And as to the note that was in the plaintiff's file regarding the conversation that resulted in the note, that states that the plaintiff has an anxiety disorder, nerve issues, social issues in college, Ms. Tucker testified that that note resulted just as an offhand jotting. She just jotted it down during a telephone conversation with one of the plaintiff's supervisors. And I actually, I had a question about, I wasn't sure I was totally understanding your argument about the note. Is the argument that even though Ms. Tucker knew or sort of offhandedly knew that she had an anxiety disorder, she didn't know that that was a disability? Is that the argument? Yes, Your Honor. Okay, so that there's sort of space between an anxiety disorder that might require you to go to the doctor, but you wouldn't necessarily know that that was a disability for legal purposes. Yes, Your Honor. As for the district court's finding as to the retaliation claim, the district court properly found there was no causal connection between the plaintiff's email disclosing her social anxiety disorder and requesting an accommodation. The evidence before the record is that Ms. Tucker made the decision to terminate Ms. Jacobs while she was out of the office. She did not check her email while she was out of the office. She did not have notice. Well, that's what she says, right? She says that the supervisors, the three supervisors testified that they did not inform her of the note. Her assistant, Ms. Tucker's assistant testified in her deposition. Right, and then Ms. Jacobs says that the printed email was on her desk when she walked in. These three people said they'd never talked with each other before Ms. Jacobs walked in the room, but yet there were notes on the email indicating that perhaps Ms. Tucker had known about the email and had made comments.  It just seems like the trial court believed Ms. Tucker and disbelieved the plaintiff. I mean, it just, it seems like this was a case, a non-jury trial that the court was conducting on a record, a bench trial that occurred rather than a motion for summary judgment. Well, I think it's important to remember that the summary judgment standard does state that mere scintilla of evidence is not enough to create a genuine issue of material fact, and I think that's exactly what we have here in terms of Ms. Jacobs' testimony that the email was printed and already had handwriting on it when she came into Ms. Tucker's office that morning. When all of the other evidence says that Ms. Tucker just didn't have notice of it. But there's also circumstantial evidence. Isn't there a timing? And Ms. Tucker's saying, we never discussed anything. Now, who's going to believe that? I mean, if I were making the argument to the jury, I'd say, they've got a problem person, they want to unload her, and yet they've never discussed it before the problem person walks into the office. So there's a lot of circumstantial stuff going on as opposed to just tangible physical evidence that the plaintiff could make use of in an argument to the trier fact. Could she not? Yes, she could. But in terms of the circumstantial evidence, the first thing that is written, the first thing that's written, and it's in the joint appendix at page 677, is not working. Not working is the first handwritten note on that printed email, which also, and we're directly to Ms. Tucker's testimony, that she wrote those notes on the email when she learned that the plaintiff was going desk to desk after she'd been terminating disrupting the office. Not working goes to disrupting the office. Right, but don't those interpretations, aren't those arguments you make to a trier fact? But here, these are all inferences. Again, the whole going to when the notes were written on the email is all of an inference. The evidence, the actual testimony evidence, is that Ms. Tucker made the decision to terminate Ms. Jacobs when she learned from her assistant that Ms. Jacobs was sleeping at the microfilm machine. She testified, I'm going to solve this problem when I return to the office, which relates back to her earlier conversation with one of the supervisors back in March, saying, I would like to get rid of the plaintiff, and saying, the next time I meet about her, she's fired. Okay, but when you look at those notes on the email, I mean, couldn't a reasonable jury infer that Tucker was writing those things to cover up, that she was writing them to really state what the situation was? That at that point, she had discovered she better have a written record? Again, Your Honor, she testified that she wrote them out of anger. She testified that she thought she was doing, the plaintiff was being goodwill, showing goodwill. So the question is, do you believe Ms. Tucker or don't you? And is that the trial court's function in the motion for summary judgment? The trial court's function is to determine if there's a genuine issue of material fact. And here, based on all of the evidence in the record before it, the trial court said, while there is this one piece of evidence, that is the plaintiff's testimony. I thought, I'm sorry, isn't the one piece of evidence the email that's dated September 9th? There's one piece of documentary evidence. The request for accommodation was forwarded to Ms. Tucker by email on September 9th. That seems like almost by itself that's going to create a disputed question. In fact, all we have is on the other side is Ms. Tucker saying, I didn't read my email for three weeks. That is correct, that she did not read her email. And that piece of evidence I was talking about was Ms. Jacobs testifying that she saw the email written. Not to one side. The email was, I mean, right, you haven't come, there's no evidence in the record suggesting that the email, you know, there was a malfunction or something, right? The email was received on September 9th. Even if it hadn't been seen on her desk, wouldn't that create a question of fact? Ms. Tucker's email receiving the email is different than Ms. Tucker learning and actually reading the email. I understand they're different, but it seems that there would be at least a pretty interesting fact question simply by virtue of delivery of the email. The timing is not a great thing for my client. I admit that, Your Honor, yes. And I'm out of time, and thank you for the time this morning. All right, thank you very much, Ms. Shields. Ms. Lucas, do you have rebuttal? Yes, Your Honor. Briefly, the defendants continue to argue based on disputed facts, and again, the lower court, unfortunately, decided to adopt these disputed facts. And at this point, remanding to a lower court, we believe should be for the whole kit and caboodle, so to speak. You have the de novo review, and we did actually brief the North Carolina law to the point on page 14 of our brief, we do give the site that the North Carolina law is interpreted consistent with the ADA. And I just want to go back to disability again for a moment. Obviously, Dr. Claudia Coleman, with her 30 years of experience and extensive expert witness experience and being a specialist in forensic evaluation, meets the qualifications under Rule 702, and there's no argument of that. So I think the case law is clear that that is a disputed issue of fact. But also, there's this misunderstanding of what social anxiety disorder is, regardless of even the facts disputed about how Ms. Jacobs acted at work. We look at condition, manner, and duration. So it's not just about when Ms. Jacobs is at work. It's when she's at home. It's what's going on in her head. And the defendants continue to argue this very significant and restrictive definition of substantially limiting, which the ADA Amendments Act has specifically said we're not going to do this anymore. And specifically with Ms. Jacobs, I think that the regs at 29 CFR Part 1630, actually in the appendix, are instructive. Because it says that condition, manner, or duration may also suggest the amount of time or effort an individual has to expend when performing a major life activity because of the effects of the impairment, even if the individual is able to achieve the same or similar results of someone who's not disabled. So the effort, the emotional effort that Ms. Jacobs is having to put in to her daily life is something that we as a layperson can't determine, which is why there's expert testimony on the disability question. And we believe that Dr. Corvin's report just ignored, actually, the ADA Amendment Act. The way substantially limited should now be interpreted by the courts. And as far as Ms.—honestly, there are huge credibility issues in this case. And that's a decision for the jury. And we do not think that that should have been made at the trial court level. And rather than sending this back down to go past the facts, given the briefing as well as the fact that, well, under retaliation, we didn't need disability there anyway. And that brings us to questions of pretext. So that has been decided by the court. So that issue overlaps with the issue of disability discrimination. And the plaintiff is asking that, given the facts related to disability, the facts related to knowledge by the clerk of both the disability going back to May 2009 and the reasonable lower court so that a jury can make these credibility determinations and weigh the evidence. And that's all I have. If there's not further— All right. Thank you very much. We will come down to brief counsel and then proceed to our next case.
judges: Barbara Milano Keenan, Henry F. Floyd, Pamela A. Harris